THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:08-CV-088-GCM

BRYAN E. GREENE, JORDON M. GREENE )
and TODD MEISTER, )
)
     **Plaintiffs,** )
)
     v. )     **ORDER**
)
GARY O. BARTLETT, LARRY LEAKE, )
ROBERT CORDLE, ANITA S. EARLS, )
BILL W. PEASLEE, and CHARLES )
WINFREE )
)
     **Defendants.** )
)

**THIS MATTER** is before the Court on Plaintiffs' Motion for Summary Judgment. Plaintiffs have brought this action under 42 U.S.C. § 1983, as well as 28 U.S.C. §§ 1331 and 1343. Plaintiffs seek to have N.C. Gen. Stat. § 163-122(a)(2) unconstitutional under the First and Fourteenth Amendments on the grounds that its ballot qualification requirements for unaffiliated U.S. Congressional candidates are unduly restrictive. For reasons given below, Plaintiffs' Motion is **DENIED**, and summary judgment is **GRANTED** in favor of Defendants.

**I. BACKGROUND**

A candidate for any federal, state, county, or municipal office can gain access to the general election ballot under North Carolina law by (1) becoming the nominee of a major political party selected by primary election, (2) becoming the nominee of a "new" political party selected at that party's state convention, or (3) being nominated by petition as an unaffiliated candidate.[1] *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1214, 1221 (4th Cir. 1995). Each

---

[1] N.C. Gen. Stat. § 163-123 allows for write-in candidates. The cases discussed in this Order universally recognize the insufficiency of the write-in process as an alternative to ballot access. *See, e.g.*, *Lubin v. Panish*, 415 U.S. 709, 719 n.5 (U.S. 1974).

avenue to ballot access comes with its own requirements imposed by state election law in order to protect the state's interest in having a fair, ordered election.

An unaffiliated or independent candidate is not a candidate of a political party as defined by N.C. Gen. Stat. § 163-96. States commonly require unaffiliated candidates to show a minimum level of support by garnering a certain number of petitions supporting their candidacy and often additionally require candidates to demonstrate the seriousness of their intent by paying a filing fee.

In North Carolina, an independent candidate must submit to the State Board of Elections petitions supporting his or her candidacy signed by at least four percent of the congressional district's registered voters as of January 1 in the year in which the election is to be held. N.C. Gen. Stat. § 163-122(a)(2). North Carolina's filing fee is one percent of the annual salary for the office sought. N.C. Gen. Stat. § 163-107. A Congressional candidate, therefore, had to pay $1,693 in 2008 and $1,740 in 2010.

In 2008, Plaintiff Bryan Green sought to run in the general election as the United States Representative from North Carolina's Tenth Congressional District. Mr. Greene ran as an unaffiliated candidate. As of January 1, 2008, the Tenth District had 411,425 registered voters. Greene was therefore required to gather and submit at least 16,457 voter signatures in order to appear on the general election ballot. As of the June 27 deadline, Greene had submitted petitions endorsed by 899 persons, 607 of which were valid signatures. This amount fell far short of the required number, and Greene was therefore not certified by the State Board as an unaffiliated candidate for the Tenth Congressional District in the 2008 general election.

Plaintiffs allege "Greene intends to run as an independent candidate for Congress in future elections, and the remaining plaintiffs intend to support his candidacy if he does run." (Compl. ¶ 22.)

Plaintiff Bradley D. Smith is currently running as an unaffiliated candidate for election as the United States Representative from North Carolina's Fifth Congressional District. N.C. Gen. Stat. § 163-122(a)(2) requires that an unaffiliated candidate running in the Fifth District submit 18,123 valid signatures to gain access to the general election ballot. At the time of filing, Smith has submitted approximately 7,500 valid signatures.

## II. DISCUSSION

### A. Standard of Review

"Summary judgment is appropriate only if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *King v. Rumsfeld*, 328 F. 3d 145, 149 (4th Cir. 2003). Evidence is viewed in the light most favorable to the non-moving party. *Id*. A district court may grant summary judgment to the non-moving party when considering a motion for summary judgment as long as the party against whom judgment was entered was given sufficient notice. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

### B. Constitutional Framework

The Constitution provides that States may prescribe the time, place, and manner of holding elections for Senators and Representatives. Art. I, § 4, cl. 1. State laws that restrict access to the ballot always implicate substantial voting, associational, and expressive rights protected by the First and Fourteenth Amendments. *McLaughlin*, 65 F.3d at 1221. Ballot restrictions can "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified

voters, regardless of their political persuasion, to cast their votes effectively." *Anderson v. Celbrezze*, 460 U.S. 780, 787 (1983) (citing *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968)). States, however, have significant latitude under the Constitution in structuring their own election law. The right to vote in any manner and the right to associate for political purposes through the ballot are not absolute. *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986).

The Supreme Court laid out the initial test for evaluating election law claims in *Anderson v. Celbrezze*. The Court has clarified the *Anderson* test to direct that

> a court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into account "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (internal citations omitted). In addition to its explicit endorsement of the *Anderson* approach, the *Burdick* Court reaffirmed the clarification that when an election law subjects constitutional rights to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id*. (citing *Norman v. Reed*, 502 U.S. 279, 288-89 (1992).

Under the *Anderson* framework, election laws are usually subject to an ad hoc balancing. While severe burdens on protected interests are subject to strict scrutiny, a rational regulation that imposes only moderate burdens could fail the balancing test if the interests it serves are minor. On the other hand, a regulation that serves no discernable state interest would not fail the balancing test if it imposes no burden. *See McLaughlin*, 65. F.3d at 1221, n.6.

When conducting this ad hoc balancing, past history is often a helpful guide. The Supreme Court provides additional clarification, stating "in the context of [state] politics, could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or

4

will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" *Storer v. Brown*, 415 U.S. 724, 742 (1974).

**C. State's Interest in Limiting Ballot Access**

It is well settled that the State has a legitimate interest in limiting access to the ballot in order to prevent ballot clutter and voter confusion, as well as discourage frivolous candidates. "We have recognized that, 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Anderson*, 460 U.S. at 788 (quoting *Storer*, 415 U.S. at 730). Regarding the petitioning requirements at hand, "The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." *Id* at 788. Additionally, the Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194. Such a requirement would ensure a state's political system must sustain a certain level of damage before the legislature could take corrective action. *Id*. at 195.

**D. North Carolina's Ballot Access Requirements for Unaffiliated Candidates**

Plaintiffs contend that North Carolina's 4% signature requirement impermissibly restricts an unaffiliated candidate's access. They additionally argue the disparity in signatures required between unaffiliated candidates and candidates of new political parties for U.S. House, as well as the difference between the Senate and House requirements, impermissibly discriminates against unaffiliated candidates.

A court must determine if "the totality of the [state's] restrictive laws taken as a whole imposes a[n unconstitutional] burden on voting and associational rights." *McLaughlin*, 65 F.3d at 1223 (citing *Williams v. Rhodes*, 393 U.S. at 34). *Storer* further notes, "a number of facially valid election laws may operate in tandem to produce impermissible barriers to constitutional rights." 415 U.S. at 737. As higher signature requirements have been upheld, this Court must look towards the totality of the burden placed upon an unaffiliated candidate in determining whether the petitioning requirement is unconstitutionally high.

While the Supreme Court has not given any standard for precisely determining what constitutes a "severe restriction" and thus triggers strict scrutiny, under the *Anderson*, *Burdick*, and *Storer* framework, it is clear that North Carolina's election laws place severe restrictions upon unaffiliated candidates. It is undisputed under the *Storer* test that unaffiliated candidates do not regularly qualify for the general election ballot in North Carolina. *See McLaughlin,* 65 F.3d at 1221(analyzing ballot access restrictions for minor parties under strict scrutiny because their political participation was "extremely difficult" and the burden on candidates was "undoubtedly severe"); *Delaney v. Bartlett,* 370 F. Supp. 2d 373, 278 (M.D.N.C. 2004) (holding the variance in the State's ballot access requirements sufficiently severe to warrant strict scrutiny). Therefore, N.C. Gen. Stat. § 163-122(a)(2) will be upheld only if it is narrowly drawn to advance a compelling state interest. This Court will address the constitutionality of (1) the difference in the requirement for unaffiliated Congressional candidates compared the requirements for new party Congressional candidates, (2) the difference in the requirement for unaffiliated Congressional and statewide or Senate candidates, and (3) the 4% requirement with respect to the totality of the burden placed on unaffiliated Congressional candidates.

### 1. Disparity between new party and unaffiliated Congressional petitioning requirements

The difference between North Carolina's 4% requirement for unaffiliated Congressional candidates and the signature requirement for new party candidates (2% of the voters in the last gubernatorial election) does not create a violation of Plaintiffs' equal protection rights. Plaintiffs' argument fails to recognize the substantive difference between recognition of new parties on a statewide basis and an unaffiliated candidate's qualification for a single district.

Plaintiffs contend that the disparate treatment of unaffiliated candidates for U.S. Congress in this case is indistinguishable from that in *Delaney v. Bartlett*. *Delaney* invalidated N.C. Gen. Stat. § 163-96 for substantially disadvantaging unaffiliated candidates without justification. 370 F. Supp. 2d at 374. Section 163-96 required an unaffiliated candidate for the U.S. Senate to file petitions signed by at least 2% of the State's registered voters while a new political party can place its candidates on the ballot with petitions signed by only 2% of the votes cast in the preceding gubernatorial election. The practical implication of this law was that an unaffiliated candidate had to file over 90,000 valid signatures compared to the 58,800 signatures a new party was required to file in order to gain access to the general election ballot for U.S. Senate. *Delaney* held that the state's interest in preventing ballot clutter and voter confusion would be adequately served by the less restrictive means of applying the new party standard to both types of candidates.

*Delaney* compared two statewide criteria, one for new parties and one for unaffiliated candidates, and held that the State could not hold unaffiliated candidates to a higher signature requirement. As North Carolina's electoral scheme only provides for recognition of parties at the statewide level, this comparison cannot be drawn because a party cannot be recognized only within a district. Due to new party candidate's inability to be recognized at the district level, the

different standard for an unaffiliated Congressional candidate seeking ballot access solely within a district does not create the discrimination of similarly situated persons or entities required for an equal protection violation.

### 2. Disparity between House and Senate Requirements for Unaffiliated Candidates

Plaintiffs additionally contend there is no rational basis for the 4% requirement when North Carolina requires unaffiliated candidates running for statewide office (including U.S. Senate) to obtain signatures from only 2% of the voters in the last gubernatorial election to qualify for the ballot. Plaintiffs rely upon *Illinois State Board of Elections v Socialist Workers Party*, 440 U.S. 173 (1979) to support their argument that different requirements for district and statewide candidates violates equal protection.

In *Illinois State Board of Elections*, the structure of Illinois' election law required an independent candidate in Cook County to submit almost 60,000 signatures (5% of those who voted in the most recent election in that political subdivision) to qualify for a ballot while a statewide candidate faced a fixed requirement of more than 25,000 qualified voter signatures.

Here, the highest number of signatures an unaffiliated candidate would be required to present is 22,549 (N.C. 4th Congressional District), and a candidate for the U.S. Senate in the 2008 election would have to present 85,379 signatures. This is much different from the anomaly that occurred in *Illinois State Board of Elections* due to the population density of the Chicago area.

Plaintiffs further claim that the additional resources and effort required by a statewide petitioning drive is offset by the fact that petitioning in congressional districts is made more difficult by voters' uncertainties about which district they live in. (Winger Decl. ¶ 2.) Since voters do know what state they live in, the rate of invalid signatures on statewide petition drives

8

is obviously much less.

This Court does not find Plaintiffs' suggestion convincing. Of North Carolina's 100 counties, almost three-quarters (72) are wholly contained within a single congressional district. Furthermore, as discussed below, North Carolina places no restrictions on the free circulation of petitioning drives. As evidenced by the sometimes-invalid signatures on petitions, voters can freely sign any petition supporting any candidate of their choosing. The fact that Congressional candidates might have to look at a map to determine where to focus their petitioning efforts in the small number of counties not wholly contained within the district in no way outweighs the additional resources and effort required to gain 50,000+ signatures in a statewide drive. Each district at most would have several split counties. Additionally, petitions for statewide office must be signed by at least 200 registered voters from each of four congressional districts in North Carolina. N.C. Gen. Stat. §163-122(a)(1). As with the difference in new party requirements discussed above, Plaintiffs try to draw a comparison between two separate and distinctly situated requirements, and therefore fail to show any violation of their equal protection rights.

### 3. North Carolina's 4% petitioning requirement

This Court must lastly examine the 4% petitioning requirement within the totality of the burden placed on unaffiliated candidates. As the burdens placed on independent candidates by North Carolina's election scheme are undoubtedly "severe restrictions" given the rate at which unaffiliated candidates qualify for the ballot, the 4% requirement will only be upheld if it is narrowly drawn to achieve a compelling state interest. *Burdick*, 504 U.S. at 434. While on the high end of the petitioning requirement spectrum, North Carolina's 4% requirement passes strict scrutiny because it is the only aspect of North

Carolina's election requirements that presents a barrier of any significance to an unaffiliated candidate.

With the latitude the Constitution gives the States to regulate their elections, a range among the petitioning requirements for independent candidates will invariably arise. The interest a state has in regulating elections is undisputed, and simply because the North Carolina Legislature has deemed it prudent that North Carolina require a greater showing of support for unaffiliated candidates than the majority of her sister states does not convince this Court that the 4% requirement is not narrowly drawn. As the *McLaughlin* Court stated, "it is beyond judicial competence to identify, as an objective and abstract matter, the precise numbers and percentages that would constitute the least restrictive means to advance the state's avowed and compelling interests." 65. F.3d. at 1222. Such a calculation is precisely what Plaintiffs ask this Court to do, and in the absence of any showing of discrimination towards unaffiliated candidates as discussed above, this Court cannot say as a matter of law that the 4% signature requirement chosen by the legislature is not the least restrictive means necessary to achieve the State's compelling interests.

The Supreme Court's ruling in *Jenness v. Fortson*, 403 U.S. 431 (1971) is particularly influential in this Court's decision. In *Jenness*, the Supreme Court upheld Georgia's requirement that independent candidates file petitions endorsed by 5% of the registered voters in the preceding election eligible to vote for the office in question. The Court in *Jenness* focused on Georgia's lack of restrictions on the free circulation of petitions in upholding the 5% requirement.

North Carolina similarly places no restrictions on petitions. For example, in North Carolina, residents may sign as many different petitions as they like, residents do not need to declare that they will vote for a candidate, participation in primaries in no way affects petitioning eligibility or vice versa, and the signatures do not need to be notarized. The Georgia law gives 180 days for the collection of the signatures. North Carolina's lesser 4% signature requirement comes with a one and half year time frame for collection.

Though decided before *Anderson*, the Supreme Court has continued to cite *Jenness* as good law. As recently as 2008, the Court cited *Jenness* as authority for the principle that "States may require persons to demonstrate 'a significant modicum of support' before allowing them access to the general election ballot, lest it become unmanageable." *N.Y. State Bd. Of Elections v. Lopez Torres*, 552 U.S. 196, 204 (2008); *see also Anderson*, 460 U.S. at 787 n.9; *Storer*, 415 U.S. at 732. Additionally, a 3% signature requirement has been recently upheld in Alabama. *Swanson v. Worley*, 490 F. 3d 894 (11th Cir. 2007).

Plaintiffs assert that no independent candidate for U.S. House has ever in any state overcome a petition requirement greater than 12, 919 signatures and no independent candidate for Congress has ever qualified for the North Carolina general election ballot. This statement is refuted by the successful effort of Wendell Fant to gain ballot access in the 2010 election. Mr. Fant has submitted 35,425 signatures, 21,076 of which have been validated. This amount is well over the 16, 2929 signatures required for ballot access in the 8th Congressional district.

While a state's election scheme must be assessed as a whole, the only other requirement Plaintiffs argue further restricts ballot access is North Carolina's filing fee. Plaintiffs contend this fee is sufficient evidence of a candidate's seriousness and support. Plaintiffs, however, have failed to show how this filing fee materially affects any candidate's chances of gaining access to the ballot. N.C. General Statute § 163-107 sets the fee at 1% percent of the annual salary of the office sought. A candidate for U.S. Congress in 2008 had to pay $1,693 and in 2010 will pay $1,740. North Carolina is tied for the third highest filing fee with three other states—Montana, Washington, and West Virginia. (P. Motion 9.) While the payment of a filing fee is certainly indicative of a candidate's seriousness, Plaintiffs have failed to demonstrate how such a fee combines with the 4% requirement to enhance the restrictiveness of North Carolina's election scheme. Plaintiffs' main contention is that the signature requirement is unattainable, not that candidates are meeting such a requirement and then lacking the funds to pay the filing fee.

While admittedly restrictive, North Carolina does not have the highest petitioning requirement, nor is it the most restrictive state. Georgia sets its filing fee for an independent U.S. House candidate at 3% of the annual salary, or $5,220 in 2010. Georgia has the highest signature requirement (5%) and the second highest filing fee. If Georgia's more restrictive election scheme does not violate the First and Fourteenth Amendments, and the continued deference given to *Jenness* by the Supreme Court strongly supports this, then neither does North Carolina's less restrictive scheme.

Defendants were able to identify over 80 unaffiliated candidates since 1992 that have met the 4% standard in running for North Carolina House, Sheriff, Clerk of Court,

School Board, Register of Deeds, and County Commissioner. Plaintiffs have failed to show how this standard is also not acceptable as the least restrictive means to ensure fair and efficient elections for U.S. House in North Carolina's congressional districts.

## III. CONCLUSION

For the reasons given above, this Court concludes that N.C. Gen. Stat. § 163-122(a)(2) is constitutional. As this case presents purely legal questions, and Plaintiffs have been given sufficient notice, summary judgment is appropriate for Defendants. Therefore, Plaintiffs' Motion for summary judgment is **DENIED** and summary judgment is **GRANTED** in favor of Defendants.

**SO ORDERED.**

Signed: August 24, 2010

Graham C. Mullen
United States District Judge

13